**GENOVA BURNS LLC**
Angelo J. Genova, Esq. (005501979)
Matthew I. W. Baker, Esq. (053092013)
494 Broad Street
Newark, New Jersey 07102
T: (973) 533-0777
agenova@genovaburns.com
mbaker@genovaburns.com
*Attorneys for Plaintiffs Paul Qassis and Petra Holdings, LLC*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL QASSIS and PETRA HOLDINGS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> BOROUGH OF CARLSTADT <br><br> Defendant. | Civil Action No.: _____ <br><br><br> **COMPLAINT** |

Plaintiffs Paul Qassis ("Qassis") and Petra Holdings, LLC ("Petra" and collectively, "Plaintiffs"), by way of this Complaint against defendant Borough of Carlstadt (the "Borough" or "Defendant"), state as follows:

## INTRODUCTION

1.      This action is based on the Borough's unconstitutional and illegal taking of Plaintiffs' property and the Borough's sustained and discriminatory effort to frustrate Plaintiffs' attempts to develop that property, arising from the Borough's initial refusal to comply with its Mount Laurel affordable housing obligations, and the Borough's intent to discriminate against Qassis based on his ethnicity, displayed most brazenly when a Borough employee called Qassis a "sand-nigger" at a public hearing related to an application to the Zoning Board of Adjustment.

#16564423v2 (23738.002)

## PARTIES

2.     Plaintiff Qassis is an individual residing in Essex County, New Jersey.

3.     Plaintiff Petra is a limited liability company, with headquarters located at 60 Montclair Avenue, Cedar Grove, New Jersey 07009.  Qassis is the Managing Member of Petra.

4.     Defendant is a municipal corporation of the State of New Jersey, maintaining offices at 500 Madison Street, Carlstadt, New Jersey.

## JURISDICTION AND VENUE

5.     This action arises under the Constitution and Laws of the United States, including 42 U.S.C. § 1983. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

6.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in the District of New Jersey.

## FACTUAL AND LEGAL BACKGROUND

### A.  Carlstadt's History of Opposing Affordable Housing

7.     In Southern Burlington County N.A.A.C.P. v. Mount Laurel Township, 67 N.J. 151 ("Mount Laurel I"), cert. den., 423 U.S. 808 (1975), and again in Southern Burlington County N.A.A.C.P., et al. v. Mount Laurel Township, et al., 92 N.J. 158 (1983) ("Mount Laurel II"), the New Jersey Supreme Court held, generally, that municipal land use regulations that prevent affordable housing opportunities for the poor violate the State Constitution, and ordered all New Jersey municipalities to plan, zone for, and take affirmative actions to provide realistic opportunities for their fair share of the region's need for affordable housing for low- and moderate-income households.  The principle established by these cases and their progeny has come to be recognized as the "Mount Laurel Doctrine".

8.      In 2003, developer Tomu Development Company, Inc. ("Tomu") filed a lawsuit in New Jersey Superior Court against the Borough, among others, alleging that the Borough had engaged in a pattern of exclusionary zoning that failed to address its obligations under the Mount Laurel Doctrine.  This lawsuit, docket number BER-L-5894-03, was consolidated with a similar lawsuit filed by Tomu against a neighboring municipality, among others, docket number BER-L-5895-03 (these consolidated cases are referred to as "Tomu I").

9.      Tomu I resulted in, among other things:

    a.  a declaration by the trial court that Tomu was entitled to relief;

    b.  a declaration that the Borough "failed to comply with [its] express obligations to provide realistic opportunities for affordable housing within [its] borders";

    c.  the creation of a Mount Laurel Implementation Monitor ("Monitor") for the Borough, as an independent judicial officer with broad powers; and

    d.  the appointment of Robert T. Regan, Esq., as the Monitor.

10.     Specifically, in describing the powers vested in the Monitor, the Tomu I court specifically held that:

    a.  Excluding matters within the sole jurisdiction of the New Jersey Meadowlands Commission, no zoning permit, building permit, or any other authorization to use or develop land or structures within the Borough shall be valid until and unless it is reviewed and approved by the Monitor.

    b.  The Monitor shall have unfettered access to all documents and information the Monitor determines are necessary to assist it in the execution of its duties, and shall have the authority to meet with, and require reports on any relevant subject from any officer, agent, or employee of the Borough.

    c.  The Monitor shall adopt all necessary rules and regulations (including, if appropriate, interim or temporary rules and regulations)—in lieu of zoning, land use, and development ordinances—that will immediately provide reasonable opportunities for the creation of low and moderate income housing in accordance with the Federal Housing Administration and the rules and regulations of Council On Affordable Housing. The Borough shall immediately adopt by ordinance the Monitor's rules and regulations as its land use legislation, and upon the Borough's

3

failure or refusal to do so, said rules and regulations shall nevertheless substitute for and act as the Borough's land use laws, to be enforced as such by the Monitor and the Borough's agents, officers, and employees.

d.  The Monitor shall oversee and review all applications for development, requests for land use or building permits, requests for interpretations, and appeals that would otherwise be within the jurisdiction of the boards of adjustment, planning boards, or administrative officials' jurisdiction under the Municipal Land Use Law.

e.  The Monitor shall have the authority to disapprove, reverse, or reject any application for development, application for a land use or building permit, request for an interpretation, or appeal if it would frustrate, impede, or counteract the creation of low and moderate income housing in the Borough. Similarly, the Monitor shall have the authority to overrule and reverse the denial of an application for development, request for a land use or building permit, request for an interpretation, or appeal if, in the exercise of the Monitor's discretion and judgment, such application for development, request for a land use or building permit, request for an interpretation, or appeal would foster the creation of low and moderate income housing opportunities.

f.  All zoning, land use, and development ordinances of the Borough, including site plan and subdivision ordinances, are hereby suspended and rendered ineffectual relating to any and all future land use, construction, or development efforts in the Borough. Such ordinances shall be treated as advisory only and shall serve as commentary to serve the Monitor. Said ordinances, however, shall continue in full force and effect for all uses and structures that currently exist (meaning that there is a valid certificate of occupancy or building permit in effect) in order to prevent the illegal use of land and structures. Uses and structures that have been approved by a local construction official, zoning officer, board of adjustment, or planning board but have not yet commenced operation or begun construction are prohibited from commencing operation or beginning construction until reviewed and approved by the Monitor for compliance with this judgment.

11.  The trial court's disposition of Tomu I – which encompassed an oral opinion dated December 3, 2004, a written opinion dated November 10, 2005, and oral and written opinions dated May 2006 – was affirmed by the New Jersey Superior Court, Appellate Division, by opinion dated September 3, 2008, in Tomu Development Co., Inc. v. Borough of Carlstadt, A-5741-05T1/A-5512-05T1/A-5621-05T1, 2008 WL 4057912 (App. Div. Sep. 3, 2008) ("Tomu II"), certif. den., 197 N.J. 474, cert. den., 558 U.S. 818 (2009), which specifically noted that

4

"[t]he appointment of the Implementation Monitor, with defined powers, is an inspired and appropriate exercise of the court's judicial powers, consistent with the Mount Laurel decisions, to assume oversight responsibility for the constitutional right to have zoning throughout New Jersey appropriately accommodate affordable housing where, as here, the municipalities neglected such constitutional obligations." Id. at *7.

12.     Robert T. Regan, Esq., has served as the Monitor since his appointment pursuant to Tomu I in or around 2005.

### B. Carlstadt's Initial Resistance to Petra's Project

13.     From May 2011 to the present, Plaintiffs have owned the real estate known as Block 59, Lot 14 on the Borough's tax map, also known as 491 Broad Street, Borough of Carlstadt, Bergen County, New Jersey (the "Property").

14.     From 2012 to 2017, Plaintiffs operated a large restaurant and lounge, named "The Balcony", which was located on the Property.

15.     The Balcony, which had approval for 242 occupants, was a successful restaurant and business, and hosted live musical performances several times per week.

16.     Beginning in or around 2010, the Borough began to unjustifiably hassle and harass The Balcony and its patrons by issuing frequent and excessively harsh citations for minor violations of parking and noise regulations.

17.     In 2013, while Qassis was contesting certain of these citations issued by the Borough, the Borough's Mayor and/or a member of the Borough Council suggested to Qassis that the Borough would likely continue to issue those types of citations to The Balcony and its patrons, and that a residential development would be a better use of the real property on which The Balcony was located.

18.     Following the advice of the Borough's Mayor and/or a member of the Borough Council, Qassis and Petra submitted an application to the Zoning Board of Adjustment of the Borough (the "Zoning Board") in March 2014.  The application was for a variance from the terms of the Zoning Ordinance to permit the construction of a ten-unit residential dwelling, including two units that would qualify as affordable housing under the Mt. Laurel doctrine, at 491 Broad Street specifically requiring a density variance, bulk variances, and waivers from various standards established in the Site Plan Ordinance.

19.     After public hearings on Petra's application on December 8, 2014, and January 19, 2015, the Zoning Board denied Petra's application on January 19, 2015.

20.     Petra subsequently submitted a revised application, reducing the scope of the project to eight units including one unit that would qualify as affordable housing under the Mt. Laurel doctrine, to the Zoning Board.

21.     On February 25, 2015, the Zoning Board held a hearing on Petra's revised application and denied it, by a 4-3 vote.

22.     On March 23, 2015, the Monitor reversed the Zoning Board's denial of Petra's revised application, and granted to Petra the site plan waiver approval and variance relief requested.

23.     On May 7, 2015, the Borough and the Zoning Board filed a Verified Complaint in Lieu of Prerogative Writs, Dkt. No. BER-L-004329-15 in the New Jersey Superior Court, Bergen Vicinage, against Petra and the Monitor, generally alleging that the Monitor's March 23, 2015, decision reversing the Zoning Board's denial of Petra's revised application was unsupported, arbitrary, capricious, and unreasonable (the "2015 Litigation").

24.     At one of the hearings or public meetings in 2015 related to Petra's revised application, the Borough's Fire Department Chief, falsely and with no factual basis, verbally accused the Monitor of being on Petra's "payroll" and of receiving "kickbacks" from Petra in exchange for approval of the project.  The Borough's Fire Department Chief also called Qassis, who is a practicing Catholic of Lebanese descent, a "sand-nigger", "Muslim terrorist", "Arab terrorist", and "camel jockey".

25.     The parties, as part of a settlement of the 2015 Litigation, negotiated an agreement as to the issues raised in the 2015 Litigation and agreed upon a Consent Order, entered by the court, remanding the proposed settlement, which included a further revised plan for the eight unit development agreed upon by Petra, to the Zoning Board for a hearing pursuant to Whispering Woods at Bamm Hollow v. Middletown Planning Bd., 220 N.J. Super. 161 (Law Div. 1987), which generally held that a settlement regarding a planning board's or a zoning board of adjustment's decision requires a public hearing on the agreed-upon plan.

26.     On September 21, 2016, the Zoning Board held a Whispering Woods hearing and granted approval of Petra's further revised plan for the project.

**C.   Carlstadt Attempts to Take Credit for the Project's Affordable Housing, Then Reneges on Its Obligations Under the Settlement in the 2015 Litigation.**

27.     On March 10, 2015, the New Jersey Supreme Court issued a decision in In the Matter of the Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1 (2015) (commonly referred to as "Mount Laurel IV") vesting primary jurisdiction over affordable housing maters in the State's trial courts, and establishing a process whereby certain municipalities could initiate a declaratory judgment action in the trial courts to seek a judgment that the municipality's Housing Element and Fair Share Plan ("HEFSP")

satisfies that municipality's constitutional obligation, and to seek protections from exclusionary zoning (also known as "builder's remedy") lawsuits.

28.     On July 9, 2015, the Borough commenced a declaratory judgment action in New Jersey Superior Court, captioned <u>In the Matter of the Application of the Borough of Carlstadt for a Judgement of Compliance and Repose</u>, Dkt. No. BER-L-6392-15 ("<u>In re Carlstadt</u>"), pursuant to <u>Mount Laurel IV</u>, and seeking approval of the Borough's HEFSP.

29.     After negotiations, the Borough entered into a settlement agreement with the Fair Share Housing Center ("FSHC"), and with the assistance of a court-appointed Special Master, to satisfy the Borough's affordable housing obligations and resolve the <u>In re Carlstadt</u> matter.

30.     The terms of the settlement in <u>In re Carlstadt</u>, as noted in an Order entered by the Hon. Gregg A. Padovano, J.S.C., on November 18, 2019, include the Project and its one (1) proposed affordable unit, which would result in a one (1) unit bonus credit since it was a rental family unit, for a total of two (2) credits toward the Borough's constitutional affordable housing obligation.

31.     Judge Padovano's November 18, 2019, Order in <u>In re Carlstadt</u> also conditions the Court's entry of a Final Judgement of Compliance and Repose on, among other things: (i) the Planning Board's adoption of, and the Borough Mayor's and Council's endorsement of, a HEFSP consistent with the terms of the settlement agreement; and (ii) the Borough's adoption of all ordinances and resolutions needed to implement the HESFP.

32.     From 2017 through 2019, the Zoning Board and Petra made and agreed upon certain additional revisions to the plans for the project, which were memorialized either in resolutions adopted by the Zoning Board during this period, or in the draft Developer's Agreement that both Petra and the Borough negotiated up to and through May 2020.

33.     The Zoning Board's April 22, 2015, resolution contained a provision that required Petra to execute a Developer's Agreement with the Borough in order to proceed with construction on the project.

34.     Borough Attorney Joseph Donahue, Esq. (the "Borough Attorney"), negotiated the terms of the Developer's Agreement with Petra.

35.     During these negotiations, and for the specific purpose of avoiding further confrontations with the Borough, Petra agreed to all, or at least the overwhelming majority, of changes to the Developer's Agreement suggested by the Borough.

36.     Also during these negotiations, a Borough official approached Qassis and expressed that the Borough was interested in purchasing the Property.

37.     Petra also entered into an agreement to borrow funding for the Project from Centra 491 Broad Partners LLC ("Centra Loan Agreement") in the amount of $2,000,000.  The Centra Loan Agreement was a "hard money" loan requiring repayment at above-market interest rates with the Property as collateral, meaning that the longer the project takes to complete and the more delays that occur, the more Petra would have to pay in interest when repaying the loan.

38.     In May 2020, as the Developer's Agreement was being finalized, Borough Construction Official Frank Recanati (the "Construction Official") represented to Plaintiffs that the construction permits for the project's foundation and footings would be issued as soon as the Developer's Agreement was fully executed.

39.     Once Petra and the Borough Attorney had finished negotiating the terms of the Developer's Agreement, the Borough Attorney assured Petra on May 11, 2020, that approval of the execution-ready copy of the Developer's Agreement would be on the Borough Council's agenda for its May 20, 2020, meeting.

40.     On May 19, 2020, Qassis executed the Developer's Agreement on behalf of Petra, and Petra, shortly thereafter, submitted the Developer's Agreement to the Borough for formal approval and execution.

41.     However, on May 26, 2020, Petra's counsel e-mailed the Monitor, copying the Borough Attorney, inquiring about the status of construction permits that the Construction Official had promised would be issued once the Developer's Agreement was fully executed, but had yet to issue.

42.     On the same day, the Monitor responded to the e-mail from Petra's counsel by representing that "[i]f the permit is not issued today, I will issue it and authorize commencement of work."

43.     On the same day, and in response to these e-mails, the Borough Attorney first informed the Monitor, while copying Petra's counsel, that: "The Governing Body [of the Borough] and the adjacent property owners are opposed to this project and do not believe it is in the interest of the Borough of Carlstadt or its residents to move forward with the current plans.  We understand your position as the Court appointed monitor and leave it to you to execute the Developer's Agreement signed by Mr. Cohen and his client and to issue appropriate construction permits."

44.     On the same day, the Monitor responded to the Borough Attorney and to Petra's counsel that Petra "is authorized to begin construction."

45.     On or around June 4, 2020, the Monitor executed the Developer's Agreement on behalf of the Borough.

46.     The Construction Official, despite representing that construction permits for the project's foundation and footings would be issued as soon as the Developer's Agreement was

fully executed, refused to issue these permits even after being presented with the Developer's Agreement executed by Petra and the Monitor on behalf of the Borough.

47.     Nevertheless, Petra promptly resubmitted the performance guaranty originally delivered to the Borough in March 2020 together with the escrow deposit for professional fees as required by the Developer's Agreement, and timely began excavation at the project site on June 12, 2020.

**D.  Carlstadt Takes Affirmative Steps to Undermine the Project.**

48.     On the night of June 13, 2020, a Stop Work Order was issued by a Borough official and copies of the order were posted on the chain-link fence surrounding the project.

49.     By letter dated June 15, 2020, the Monitor ruled that the Stop Work Order was "invalid and has no legal effect" and that Petra "is hereby authorized to remove the Stop Work Order from the chain link fence and to continue working at the site." The Monitor's June 15 letter further characterized the Borough's Stop Work Order as "just another effort by the Borough of Carlstadt to obstruct and prevent the construction of the inclusionary development on the subject property."

50.     Later on June 15, 2020, the Monitor agreed to permit a renewed Stop Work Order to remain in effect until June 17, 2020, based upon the Borough Attorney's representation that Petra's work on the project "appears to have encroached upon" an adjoining real estate parcel (the "Nicoletti Property") located at 497 Broad Street in the Borough.

51.     The Borough Attorney made this representation despite the fact that Petra and Steve Nicoletti, the owner of the Nicoletti Property, had entered into a License, Indemnity and Protection Easement Agreement, dated May 21, 2019, which granted Petra a license and easement to enter upon the portions of the Nicoletti Property necessary for the purposes of

performing work on the project and protecting the Nicoletti Property against damage caused by work on the project, and which obligated Petra to take commercially reasonable measures to prevent any material damage to the Nicoletti Property.

52.     During discussions regarding this Stop Work Order, the Construction Official expressly told Qassis that the Stop Work Order was issued in retaliation for the Monitor authorizing Petra to begin construction the project without the Borough-issued construction permits, and that the Borough would continue such conduct for the duration of the project.

53.     The Construction Official also expressly told Qassis that he believed the Monitor had no authority to issue a permit or otherwise authorize construction on the project, which is both factually incorrect under the Tomu I decision, and runs contrary to the Borough Attorney's May 26, 2020, e-mail "leav[ing] it to [the Monitor] to execute the Developer's Agreement signed by Mr. Cohen and his client and to issue appropriate construction permits."

54.     Once construction resumed, Petra continued to stage the property for the project pursuant to the plans and guidance issued by Petra's engineer, Reme and Associates, LLC ("Reme").  However, the Borough continued to attempt to frustrate the progress of the project.

55.     The Borough issued unjustified fines to Petra purportedly regarding its construction activities at the project.

56.     However, when Petra contested these fines before the Bergen County Construction Board of Appeals, the Borough withdrew the fines without any explanation.

57.     The Borough has also stationed police officers near the Property for the purpose of issuing summonses to the drivers and operators of trucks and other heavy machinery servicing the project.

58.     Additionally, between June 19 and July 10, 2020, officials from the Borough visited the project every day, sometimes multiple times each day, to attempt to stop or slow construction of the project and intimidate Qassis.

**E.  Carlstadt Claims a Fake "Emergency" and Effects a Taking of the Property in Order to Obstruct the Project.**

59.     Reme's shoring calculations and plans were submitted to the Borough for review on June 19, 2020, and the Borough did not express any objections to those calculations and plans.

60.     Further, Reme noted, in a letter to Petra's development counsel dated July 1, 2020, that Reme had conducted an inspection of the Property on June 29, 2020, to ensure that there were no issues with the excavation and shoring efforts put in place to that date.

61.     Notwithstanding that no issues were observed during its inspection, and in light of the delays caused by the Borough, Reme revisited its design in order to install a more robust shoring that would help prevent loss of material from behind the shoring.  These revised designs were submitted to the Borough on July 7, 2020, and the Borough did not express any objections to the revised designs.

62.     On July 10, 2020, however, the Borough issued an emergency declaration claiming that Petra's excavation work on the project threatened the Nicoletti Property in light of inclement weather that day.

63.     As part of the Borough's emergency declaration, the Borough hired contractor J. Fletcher Creamer & Son, Inc. ("Fletcher Creamer") to backfill the excavation of the Project by dumping several truckloads of stones into the site, effectively rendering further construction impossible.  Fletcher Creamer backfilled the project site, buried Petra's excavator, and bulldozed

the safety fence erected around the project site.  Neighbors adjacent to the Property were cheering and calling Qassis derogatory names.

64.     Section 26.6 of the Developer's Agreement provides, in relevant part, that "[i]f any emergency shall arise, the Borough will immediately notify the Developer on the site," and only empowers the Borough to take corrective measures as it deems necessary "[i]f no action is promptly taken by the Developer[.]"

65.     However, on July 10, 2020, the Borough provided Petra with less than an hour's notice before declaring an emergency and directing Fletcher Creamer to backfill the Project site.

66.     Indeed, the Borough had been in communication with Fletcher Creamer about backfilling the site for several days leading up to the July 10, 2020, emergency declaration.

67.     Further, Qassis, upon being notified of the Borough's emergency declaration, promptly responded to the Project site in the afternoon of July 10, 2020, and began taking corrective measures that the Borough had requested, even though Reme had deemed these measures to not be necessary.

68.     Qassis was at the Project site when trucks from Fletcher Creamer arrived, but the Borough's personnel ignored Qassis's efforts – even though the inclement weather had stopped by that point as well – and directed the Fletcher Creamer trucks to backfill the Project site anyway.

69.     That day, when Qassis asked questions of the Borough officials at the site about why the Borough was backfilling the Project site after the inclement weather had stopped and in the absence of any finding that the Nicoletti Property had been damaged, he was advised, despite the destruction Fletcher Creamer was causing at the site, that he would be arrested for "obstruction" and jailed if he interfered with the Borough's operation in any way.

14

70.     One point of contention was whether or not Petra, on its own initiative, had placed sufficient fill against the excavated walls. If Petra had placed fill against the excavated walls to within five feet of the ground surface, additional backfilling would not have been necessary.  On July 10, Qassis used a tape measurer to demonstrate to the Borough Engineer that the fill already placed against the excavated walls was within five feet of the ground surface.  In response, the Borough Engineer said that he did not care what Qassis's tape measurer showed, and that the site would be backfilled regardless.

71.     The Borough and Fletcher Creamer claimed to Petra that backfilling the Project site was necessary in order to comply with, among other things, standards set by the Occupational Safety and Health Administration ("OSHA"), but the amount of stone fill placed by the Borough and Fletcher Creamer well exceeded what was purportedly required by OSHA, with no justification, further exacerbating the delay and expenses associated with the Borough's emergency declaration.

72.     On July 14, 2020, the Borough Attorney claimed to Petra that PSE&G had discontinued gas and electrical service in a residential building on a property adjoining the Project site "due to the failure of the excavation and the emergent situation last week."

73.     However, upon information and belief, it was the Borough and not PSE&G that unilaterally determined that PSE&G should discontinue gas and electrical services in the relevant building.

74.     Specifically, upon information and belief, the Borough requested that PSE&G disconnect gas and electrical service to the relevant building on July 9, 2020, the day before the Borough's "emergency" declaration.  Further, upon information and belief, neither the gas line nor the electrical lines to the relevant building were damaged, and PSE&G re-connected all

service lines by no later than July 15, 2020. Petra was billed by PSE&G for its work, at the direction, upon information and belief, of the Borough.

75.     On July 17, 2020, the Borough Attorney advised Petra by e-mail that the Borough would be charging Petra for the costs of the Borough's emergency action on July 10, 2020, and that the Borough would not lift its emergency declaration, issue the necessary foundation and footing permits, and allow the Project to resume unless and until Petra met the following five conditions, certain of which have nothing to do with the Borough's emergency declaration:

   a.  Petra must provide a "complete set of plans" to the Borough, including all structural and architectural plans, pursuant to a memo dated July 15, 2020 – i.e., after the emergency declaration – by the building inspector;

   b.  Petra must comply with the "concerns surrounding the temporary trailer on the site" as described in a July 16, 2020, letter from the Construction Official;

   c.  Petra must comply with the "concerns raised by the Borough's engineers in the Borough Engineering Reports along with the submission and approval of [Petra's] sheeting and shoring plan by the Borough";

   d.  Petra must pay "all costs and fees associated with the emergency shut down and stabilization/backfilling efforts"; and

   e.  Petra must attend and "full[y] cooperat[e] with the Borough at a construction meeting to be scheduled once items [a-d above] are fulfilled.

76.     By letter dated July 24, 2020, Petra requested that the Borough, among other things, remove the excess fill placed at the Project site at its own expense, and reimburse Petra for all documented costs associated with the Borough's emergency declaration.

77.     By letter dated July 29, 2020, the Borough Attorney neither denied the allegations in Petra's July 24, 2020, letter, nor addressed Petra's concerns regarding the backfilled Project site and the emergency declaration.

#16564423v2 (23738.002)

78.     By letter dated July 31, 2020, Petra requested that the Monitor issue an order that would, among other things:

> a.   waive and negate the conditions set forth by the Borough Attorney in his July 17 e-mail for the Borough to lift its emergency declaration;
>
> b.   permit Petra to remove the stone fill dumped at the Project, and proceed with construction at the Project; and
>
> c.   compel the Borough to immediately issue all necessary footing and foundation permits for the resumption of the Project, and designate another construction code official to oversee the Project if the Borough fails or refuses to issue such certifications.

79.     By letters dated August 4 and August 7, 2020, Petra provided to the Borough Attorney and the Monitor a set of revised shoring and excavation plans issued by Reme and a certification by a third-party engineer – Omar Elsherif, PhD, PE, of Structuretech Engineering PC ("Dr. Elsherif") – that such revised plans are "adequate, stable, and capable of supporting the intended lateral earth pressure design loads" and "meet[] current design codes and construction standards."

80.     By letter dated August 11, 2020, the Monitor ordered that "the conditions detailed in [the Borough Attorney's] email of Friday July 17, 2020 are deemed to be null and void, and appropriate footing and foundation permits shall be required to be issued by the Construction Official so as to permit the resumption of construction on the premises."

81.     Noting that the "development of this property has been an issue in the Borough since at least 2014," and that the Borough's recent conduct "would appear to contravene the Borough's own position" in In re Carlstadt, the Monitor's August 11 letter order characterized

the Borough's repeated refusal to execute the Developer's Agreement as "[i]ncredibl[e]" and found that the conditions imposed by the Borough Attorney's July 17 e-mail were in furtherance of the Borough's efforts to "leave no stone unturned to obstruct construction of this inclusionary development."

82.     Importantly, the Monitor's August 11 letter order also recognized and immediately diagnosed the Borough's attempts to charge Petra for the cost of the "emergency" backfilling on July 10, 2020, as a clear example of the Borough's intention "to burden [Petra] with additional cost generating requirements, contrary to the principles underlying the Mount Laurel doctrine."

83.     The Monitor's August 11 letter order specifically held that:

> I order and direct that construction may resume consistent with the plans prepared by Reme and Associates.  In addition, Petra may proceed with removing any stone necessary to proceed with development. The Borough shall immediately issue all necessary footing and foundation permits. Should the Borough fail to do so, I am prepared to retain the services of another Construction Official, at the Borough's expense, to oversee the project.  The Borough and its Construction Official should be aware that any further efforts to impede construction activities on the premises may result in the Borough losing jurisdiction over all land use matters within the Borough as I am empowered to do under the Final Judgment in the [Tomu I] decision.

84.     By letters dated August 13, August 16, and August 18, 2020, Petra requested that the Borough comply with the Monitor's order and issue the footing and foundation permits for the Project.  Petra's August 16 letter also enclosed a letter from Reme responding to certain concerns raised by the Borough, and agreeing to revise and clarify certain aspects of its earlier-submitted plans.  Such revisions and clarifications were not necessary, but were made solely to appease the Borough in the hopes that the Borough would comply with the Monitor's August 11 letter order and issue the necessary permits.

18

#16564423v2 (23738.002)

85.     However, the Borough, by correspondence dated August 14, August 17, and August 18, 2020, has taken the position that it is not obligated to issue the foundation and footing permits for the Project until and unless Petra's and Reme's shoring plans are further revised and approved by the Borough Engineer.

86.     Indeed, the Borough, in correspondence dated August 14, August 17, August 18, August 20, August 21, September 8, and September 11, 2020, specifically asserted that Section 2.1 of the Developer's Agreement required Petra to revise its shoring plans before the Borough would issue the foundation and footing permits, in direct violation of the Monitor's August 11 letter order.

87.     Additionally, on September 11, 2020, the Borough again issued a Stop Work Order, without justification and in direct violation of the Monitor's August 11 letter order.

88.     On September 14, 2020, the Monitor convened a telephone conference with representatives from Petra and the Borough, during which the Monitor encouraged both parties to have their engineers resolve any disputes so that construction on the Project could proceed.

89.     The parties' engineers met on September 15, 2020, and in order to expedite the building process, without waiver of any claims related to the Borough's delay, and to further appease the Borough in the hope that doing so would prompt the Borough to comply with the Monitor's August 11 letter order, Petra agreed to further revise its shoring plans.

90.     Petra further submitted its revised plans, supported by an additional letter by Dr. Elsherif, to the Borough on or about September 16, 2020.

91.     The Borough issued the foundation and footing permits, and lifted the Stop Work Order, on September 18, 2020.

#16564423v2 (23738.002)

92.     However, the cost of the additional materials required by the Borough – materials that were unnecessary and that Petra only agreed to incorporate into its shoring plans in order to appease the Borough – have been borne solely by Petra.

93.     Further, the cost of the Borough's delays and Stop Work Orders have also been borne solely by Petra.

94.     Indeed, upon information and belief, once the Monitor's August 11 letter order made clear that the Borough would not be able to completely stop the Project from proceeding and that the Monitor was prepared to retain the services of another Construction Official, at the Borough's expense, to oversee the Project if the Borough continued to overtly obstruct the Project, the Borough instead sought to delay the Project as much as possible and make the Project financially untenable as possible for Petra.

95.     One day during September 2020, Qassis approached the Construction Official and asked him why the Borough was obstructing the Project, and whether the Borough had any interest in the Property.   The Construction Official responded that the Borough did want to acquire the Property.

**F. Carlstadt Continues Its Violation of the Monitor's August 11 Letter Order and Plaintiffs' Civil Rights.**

96.     On or about June 8, 2021, the Borough attached as a municipal lien against the Property, a special tax assessment in the principal amount of $32,887.12.

97.     Upon information and belief, this assessment was made against the Property as a means of circumventing the Monitor's August 11 letter order and compelling Plaintiffs to pay the invoice issued by Fletcher Creamer in the amount of $32,887.12 for backfilling the Property on July 10, 2020.

98.     Despite being notified by Plaintiffs that the Borough's special tax assessment violated the Monitor's August 11 letter order and was illegal and improper, the Borough refused to remove the assessment and threatened that a tax sale of the Property would occur on July 21, 2021, if the assessment was not paid.  The tax sale was later adjourned to August 4, 2021.

99.     On or about August 2, 2021, after being notified of the Borough's actions, the Monitor sent a letter to the Borough's Tax Collector directing him to remove the Property from the tax sale.

100.    The Borough subsequently did remove the Property from the tax sale, but did not remove the special assessment or municipal lien, which remain a cloud on title to the Property.

101.    From the date of the Borough's initial Stop Work Order on June 13, 2020, through the present, the Borough has unreasonably and unlawfully delayed the project in almost every way possible, including the conduct described above related to the Borough's purported "emergency" order, and also including, but not limited to: (i) unreasonably delaying the issuance of permits; (ii) issuance of Stop Work Orders with no justification or factual basis; (iii) the imposition of additional conditions for Plaintiffs to meet in order to continue with construction of the project, over and above the requirements of the Development Agreement and applicable codes; (iv) threats by the Construction Official that Plaintiffs' failure to meet certain additional conditions would result in the issuance of more Stop Work Orders; (v) the Borough's bad faith objections – often provided only after significant delay – to drawings, plans, and calculations submitted by Plaintiffs' architect and engineer; and (vi) the Borough's insistence on unnecessary and superfluous modifications to drawings, plans, and calculations submitted by Plaintiffs' architect and engineer.

102.   The Borough's conduct in unlawfully delaying, obstructing, and resisting Plaintiff's attempts to develop the Property have damaged Plaintiffs significantly.

103.   Upon information and belief, the Borough's conduct in delaying, obstructing, and resisting Plaintiff's attempts to develop the Property has been undertaken specifically to make Plaintiffs' development activities prohibitively costly and time-consuming – i.e., to "burden [Petra] with additional cost generating requirements," as the Monitor's August 11 letter order stated – such that Plaintiffs would run out of funding to complete the project and/or agree out of frustration to sell the Property to the Borough.

104.   Indeed, as a result of the Borough's unlawful conduct in delaying, obstructing, and resisting Plaintiff's attempts to develop the Property, Petra has been compelled to seek additional loan funding including a second hard money loan in the amount of $800,000 from 491 Broad Holdings LLC, which closed in January 2022.

105.   Also as a result of the Borough's unlawful conduct, and separate and apart from the damage incurred by Petra, Qassis has suffered and continues to suffer significant and enduring emotional distress including humiliation, mental anguish, physical distress, and injury to mind and body.

**LEGAL CLAIMS**
**COUNT I**
**(Breach of Contract – Developer's Agreement)**

106.   Plaintiffs repeat and restate the allegations in the foregoing paragraphs of the Complaint as if fully set forth herein.

107.   The Developers' Agreement is a valid and enforceable agreement entered into by and between the Borough and Petra.

108.    Petra fully performed all of its contractual obligations under the Developers' Agreement.

109.    The Borough breached the Developers' Agreement by taking the actions described above, including but not limited to the issuance of several unjustified Stop Work Orders, the Borough's July 10, 2020, emergency declaration and subsequent backfilling of the Project site, and the Borough's unjustified delay in issuing the footing and foundation permits.

110.    As a direct and proximate result of the Borough's breach of the Developers' Agreement, Plaintiffs have suffered damages.

## COUNT II
**(Breach of Covenant of Good Faith and Fair Dealing)**

111.    Plaintiffs repeat and restate the allegations of the foregoing paragraphs of the Amended Complaint as if fully set forth herein.

112.    The Developers' Agreement is a valid and enforceable agreement entered into by and between the Borough and Petra.

113.    The primary purpose of the Developers' Agreement was to permit Plaintiffs to timely develop the Property through the Project in accordance with the plans that Plaintiffs previously submitted to the Borough and the approvals originally obtained from the Borough.

114.    Due to the Borough's above-described actions, including but not limited to the issuance of several unjustified Stop Work Orders, the Borough's July 10, 2020, emergency declaration and subsequent backfilling of the Project site, and the Borough's unjustified delay in issuing the footing and foundation permits, Plaintiffs have been unable to complete the development of the Property in accordance with the plans that Plaintiffs previously submitted to the Borough and the approvals originally obtained from the Borough.

115.     Instead, the Borough's above-described actions, including but not limited to the issuance of several unjustified Stop Work Orders, the Borough's July 10, 2020, emergency declaration and subsequent backfilling of the Project site, and the Borough's unjustified delay in issuing the footing and foundation permits, have caused substantial delays to, and imposed substantial and unnecessary costs on Plaintiff's development of the Project.

116.     The Borough's above-described actions were taken in bad faith with the purpose of depriving Plaintiffs of their rights under the Development Agreement, and constitute a breach of the covenant of good faith and fair dealing.

117.     As a direct and proximate result of the Borough's breach of the covenant of good faith and fair dealing, Plaintiffs have suffered damages.

### COUNT III
### (Tortious Interference with Contract – Petra's Centra Loan Agreement)

118.     Plaintiffs repeat and restate the allegations of the foregoing paragraphs of the Amended Complaint as if fully set forth herein.

119.     The Borough  knew of the Centra Loan Agreement and its terms.

120.     The Borough intentionally interfered with the Centra Loan Agreement through their actions described above and referred to herein, including but not limited to the issuance of several unjustified Stop Work Orders and the Borough's July 10, 2020, emergency declaration and subsequent backfilling of the Project site.

121.     The Borough's interference described above caused Petra to incur additional interest payments that it would not have otherwise incurred but for the interference, and has placed Petra in imminent risk of default under the Centra Loan Agreement.

122.    The Borough's interference described above and referred to herein was wrongful and was done intentionally, with malice and without justification.

123.    There is a reasonable probability that, absent the Borough's interference, Plaintiffs would have received the full anticipated economic benefit of the Loan Agreement.

124.    As a result of the Borough's interference, Plaintiffs have suffered damages.

### COUNT IV
**(Violation of 42 U.S.C. § 1983 and Takings Clause of the Fifth Amendment to the U.S. Constitution)**

125.    Plaintiffs repeat and restate the allegations of the foregoing paragraphs of the Amended Complaint as if fully set forth herein.

126.    All of the actions taken by the Borough and referred to herein – including those actions taken by Borough agencies, boards, agents and employees, including but not limited to the Borough Attorney, Construction Official, and Borough Engineer – were taken under color of state law and pursuant to a policy or custom of opposition to affordable housing and opposition to developers of Middle-Eastern descent.

127.    The Borough's actions described above, including but not limited to the issuance of several unjustified Stop Work Orders and the Borough's July 10, 2020, emergency declaration and subsequent backfilling of the Project site, caused damage to, and was a physical invasion of, the Property, and therefore constituted a physical taking of the Property.

128.    In taking the above-described actions, including but not limited to the issuance of several unjustified Stop Work Orders and the Borough's July 10, 2020, emergency declaration and subsequent backfilling of the Project site, the Borough deprived Plaintiffs of all beneficial use of the Property for several months.

129.    While taking the actions referred to herein, the Borough deprived Plaintiffs of their federally-protected right to property, and effected a temporary taking of Plaintiffs' property without just compensation, in violation of the Fifth Amendment to the United States Constitution for the period of time during which Plaintiffs were deprived of economic use of their property by the Borough's actions.

130.    As a direct and proximate result of the Borough's unconstitutional and illegal temporary taking, Plaintiffs have suffered damages.

### COUNT V
### (Inverse Condemnation)

131.    Plaintiffs repeat and restate the allegations of the foregoing paragraphs of the Amended Complaint as if fully set forth herein.

132.    Plaintiffs own the Property in fee simple absolute.

133.    The Borough's actions described above, including but not limited to the issuance of several unjustified Stop Work Orders and the Borough's July 10, 2020, emergency declaration and subsequent backfilling of the Project site, caused damage to, and was a physical invasion of, the Property, and therefore constituted a *de facto* condemnation of the Property which deprived Plaintiffs of all beneficial use of the Property for several months.

134.    The Borough took the above-described actions without initiating a condemnation proceeding, and the Borough's actions did not advance any legitimate public interest.

135.    The damage done to the Property was deliberately planned and carried out by the Borough, which singled-out Plaintiffs' Property for singular and unique treatment.

136.    Not only has the Borough refused to compensate Plaintiffs for its *de facto* condemnation of the Property, but the Borough has illegally assessed the cost of the *de facto*

condemnation against Plaintiffs as a municipal lien against the Property in the principal amount of $32,887.12.

137.    The Borough's refusal to compensate Plaintiffs for its *de facto* condemnation of the Property has damaged Plaintiffs.

**COUNT VI**
**(Violation of 42 U.S.C. § 1983 and Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution)**

138.    Plaintiffs repeat and restate the allegations of the foregoing paragraphs of the Amended Complaint as if fully set forth herein.

139.    All of the actions taken by the Borough or those employed by or acting on behalf of the Borough and referred to herein – including those actions taken by Borough agencies, boards, agents and employees, including but not limited to the Borough Attorney, Construction Official, and Borough Engineer – were taken under color of state law and pursuant to a policy or custom of opposition to affordable housing and opposition to developers of Middle-Eastern descent, and had the effect of depriving Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

140.    Qassis is a member of a protected class on the basis of his ethnicity.

141.    Qassis is similarly situated in all relevant aspects to other developers attempting to develop properties in the Borough.

142.    Nevertheless, the Borough has taken the unlawful actions described herein because of Qassis's ethnicity which unlawful actions have not been taken by the Borough against those other developers.

#16564423v2 (23738.002)

143.    All actions referred to herein taken by the Borough, or those employed by or acting on behalf of the Borough, were intentional, malicious, willful, wanton, and in gross and reckless disregard of Plaintiffs' constitutional rights.

144.    As a direct and proximate result of the Borough's unconstitutional and illegal conduct, Plaintiffs have suffered damages.

## COUNT VII
### (Violation of 42 U.S.C. § 1983 and Substantive Due Process Rights Under the Fifth and Fourteenth Amendments to the U.S. Constitution)

145.    Plaintiffs repeat and restate the allegations of the foregoing paragraphs of the Amended Complaint as if fully set forth herein.

146.    All of the actions taken by the Borough or those employed by or acting on behalf of the Borough and referred to herein – including those actions taken by Borough agencies, boards, agents and employees, including but not limited to the Borough Attorney, Construction Official, and Borough Engineer – were taken under color of state law and pursuant to a policy or custom of opposition to affordable housing and opposition to developers of Middle-Eastern descent, and had the effect of depriving Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the Due Process Clause of the Fifth Amendment to the United States Constitution, applied to the state of New Jersey through the Fourteenth Amendment.

147.    The actions referred to herein taken by the Borough, or those employed by or acting on behalf of the Borough, interfered with Plaintiffs' constitutionally protected rights as otherwise described herein and in such a way as to shock the conscience of any reasonable observer.

28

148.    The actions referred to herein taken by the Borough, or those employed by or acting on behalf of the Borough, have been so severe and such an abuse of authority as to establish a deprivation of constitutional rights.

149.    All actions referred to herein taken by the Borough, or those employed by or acting on behalf of the Borough, were intentional, malicious, willful, wanton, and in gross and reckless disregard of Plaintiffs' constitutional rights.

150.    As a direct and proximate result of the Borough's unconstitutional and illegal conduct, Plaintiffs have suffered damages.

## COUNT VIII
**(Violation of N.J. Civil Rights Act, N.J.S.A. 10:6-2, and Equal Protection Rights of Art. I, Para. 1 of the New Jersey Constitution)**

151.    Plaintiffs repeat and restate the allegations of the foregoing paragraphs of the Amended Complaint as if fully set forth herein.

152.    All of the actions taken by the Borough or those employed by or acting on behalf of the Borough and referred to herein – including those actions taken by Borough agencies, boards, agents and employees, including but not limited to the Borough Attorney, Construction Official, and Borough Engineer – were taken under color of state law and pursuant to a policy or custom of opposition to affordable housing and opposition to developers of Middle-Eastern descent, and had the effect of depriving Plaintiffs of rights secured by the New Jersey Constitution and laws, specifically the right to equal protection of the laws implicitly recognized as an "unalienable right" under Art. I, Para. 1 of the New Jersey Constitution.

153.    Qassis is a member of a protected class on the basis of his ethnicity.

154.    Qassis is similarly situated in all relevant aspects to other developers attempting to develop properties in the Borough.

29

155.    Nevertheless, the Borough has taken the unlawful actions described herein because of Qassis's ethnicity which unlawful actions have not been taken by the Borough against those other developers.

156.    All actions referred to herein taken by the Borough, or those employed by or acting on behalf of the Borough, were intentional, malicious, willful, wanton, and in gross and reckless disregard of Plaintiffs' constitutional rights.

157.    As a direct and proximate result of the Borough's unconstitutional and illegal conduct, Plaintiffs have suffered damages.

## COUNT IX
**(Violation of N.J. Civil Rights Act, N.J.S.A. 10:6-2, and Due Process Rights of Art. I, Para. 1 of the New Jersey Constitution)**

158.    Plaintiffs repeat and restate the allegations of the foregoing paragraphs of the Amended Complaint as if fully set forth herein.

159.    All of the actions taken by the Borough or those employed by or acting on behalf of the Borough and referred to herein – including those actions taken by Borough agencies, boards, agents and employees, including but not limited to the Borough Attorney, Construction Official, and Borough Engineer – were taken under color of state law and pursuant to a policy or custom of opposition to affordable housing and opposition to developers of Middle-Eastern descent, and had the effect of depriving Plaintiffs of rights secured by the New Jersey Constitution and laws, specifically the right to substantive due process implicitly recognized as an "unalienable right" under Art. I, Para. 1 of the New Jersey Constitution.

160.    The actions referred to herein taken by the Borough, or those employed by or acting on behalf of the Borough, interfered with Plaintiffs' constitutionally protected rights as

#16564423v2 (23738.002)

otherwise described herein and in such a way as to shock the conscience of any reasonable observer.

161.   The actions referred to herein taken by the Borough, or those employed by or acting on behalf of the Borough, have been so severe and such an abuse of authority as to establish a deprivation of constitutional rights.

162.   All actions referred to herein taken by the Borough, or those employed by or acting on behalf of the Borough, were intentional, malicious, willful, wanton, and in gross and reckless disregard of Plaintiffs' constitutional rights.

163.   As a direct and proximate result of the Borough's unconstitutional and illegal conduct, Plaintiffs have suffered damages.

## COUNT X
### (Violation of N.J. Law Against Discrimination, N.J.S.A. 10:5-12(l))

164.   Plaintiffs repeat and restate the allegations of the foregoing paragraphs of the Amended Complaint as if fully set forth herein.

165.   The Borough's conduct in unlawfully delaying, obstructing, and resisting Plaintiff's attempts to develop the Property constitute a refusal to contract with, trade with, provide goods to, provide services to, provide information to, or otherwise do business with Qassis on the basis of his ethnicity.

166.   As a direct and proximate result of the Borough's unlawful discriminatory conduct in violation of the N.J. Law Against Discrimination, Qassis has suffered and continued to suffer financial and economic damages as well as severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, and emotional pain and suffering.

#16564423v2 (23738.002)

167.    The Borough's unlawful discriminatory conduct constituted a willful and wanton violation of the N.J. Law Against Discrimination, was outrageous and malicious, was intended to injure Qassis, and was done with reckless indifference to Qassis's civil rights.

168.    As a result of the Borough's conduct, Qassis has suffered damages.

**WHEREFORE**, Plaintiffs demand judgment against the Borough as follows:

a.   Entry of judgment in Plaintiffs' favor for all amounts to which they are entitled, including economic, non-economic, compensatory, and consequential damages of no less than $5,000,000.00;

b.   Awarding punitive damages;

c.   Enjoining the Borough from further obstructing or interfering with the Project as construction continues;

d.   Awarding costs of suit and reasonable attorneys' fees;

e.   Awarding such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury on all claims.

**GENOVA BURNS LLC**
*Attorneys for Plaintiffs,*
*Paul Qassis and Petra Holdings, LLC*

*s/ Angelo J. Genova*
ANGELO J. GENOVA

Date:  June 10, 2022

32

#16564423v2 (23738.002)