**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL QASSIS, PETRA HOLDINGS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> BOROUGH OF CARLSTADT, <br><br> Defendant. | Civil Action No. 22-3713 (SDW) (MAH) <br><br> **OPINION** <br><br> November 10, 2025 |

**WIGENTON**, District Judge.

Before this Court is Defendant the Borough of Carlstadt's ("Defendant" or "the Borough") Motion for Summary Judgment (D.E. 109 ("Motion"))[1] pursuant to Federal Rule of Civil Procedure ("Rule") 56. Jurisdiction is proper pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons stated herein, the Motion is **GRANTED in part.**

**I.  FACTUAL BACKGROUND**[2]

---

[1] Citations to "D.E." refer to docket entries in the Court's Electronic Case Filing System for this matter and any internal citations contained therein.

[2] Consistent with Rule 56(c), this Court considers the parties' Statement of Material Facts ("SOMF") and any responses thereto, as well as the depositions and documents in the record. Where a SOMF cites to the record, this Court cites to the same. Additionally, where a party failed to counter a material fact in accordance with Local Rule 56.1's requirements, this Court deems that fact as undisputed for purposes of the Motion.

Plaintiffs Paul Qassis ("Plaintiff" or "Qassis") and Petra Holdings, LLC[3] ("Petra"), the owners of Block 59, Lot 14 ("the Property")—also known as 491 Broad Street—on the Borough's tax map, challenge the Borough's course of action as it relates to Plaintiffs' attempt to build a multi-unit residential dwelling on said Property. (D.E. 1 ("Compl.") ¶ 13.) This Court endeavors to summarize years' worth of events, highlighting the most pertinent and salient facts to Plaintiffs' Complaint and Defendant's Motion.

### A. Initial Re-Zoning Application, 2015 Litigation & Settlement

From 2012 to 2017, Plaintiffs operated a "large restaurant and lounge" on the Property. (Compl. ¶ 14.) After being issued a number of citations by the Borough and having multiple people—including the Borough's then-mayor—suggest a residential development would be a better use of the property, Plaintiffs applied for a variance from the Borough's Zoning Board of Adjustment ("the Zoning Board") in March 2014. (*Id.* ¶¶ 17–18.) Plaintiffs' initial request sought permission to build a ten-unit residential dwelling, with two of the units being designated for affordable housing. (*Id.* ¶ 18.) After two public hearings, the Zoning Board denied Plaintiffs' initial application on January 19, 2015. (*Id.* ¶ 19.)

Plaintiffs renewed their application, this time submitting a revised application seeking a variance to build an eight-unit dwelling with one affordable housing unit. (*Id.* ¶ 20.) After a public hearing, this revised application was similarly denied on February 25, 2015. (*Id.* ¶ 21.) The

---

This Court notes the majority of Qassis's Declaration lacks citations to the record and reiterates his Complaint. Thus, where relevant this Court cites to Plaintiffs' Complaint.

[3] Qassis is Petra's sole member. (D.E. 1 ¶ 3; D.E. 116-2, Qassis Decl. ¶ 1.) This Court's references to "Plaintiff" refer to Qassis, but where relevant, any mentions to Petra encompass Qassis as well.

Borough's Independent Monitor ("Monitor"), Robert T. Regan, Esquire, reversed the Zoning Board's denial and granted Petra's requests for a site plan approval and variance.[4]  (*Id.* ¶ 22.)

On May 7, 2015, the Borough filed a complaint in lieu of prerogative writs against Petra and the Monitor in New Jersey Superior Court, Bergen County, challenging the Monitor's reversal of the Zoning Board's decision.  (Compl. ¶ 23.)  Ultimately, the parties settled the 2015 litigation and entered a Consent Order in which the parties agreed Petra would submit its revised plan for an eight-unit development to the Zoning Board for a *Whispering Woods* hearing.[5]  (Compl. ¶ 25.)  The Zoning Board held the *Whispering Woods* hearing on September 21, 2016, and approved Plaintiffs' revised plan.  (*Id.* ¶ 26; D.E. 109-2, Borough Ex. J at 216.)

### B.  Subsequent Negotiations and the Developer's Agreement

Notwithstanding the approval of Plaintiffs' revised plan to build an eight-unit development, the parties continued negotiating several aspects and details pertinent to the development's construction from 2017 to May 2020.  (D.E. 109-11 ("Borough SOMF") ¶ 37.)  On May 26, 2020, however, the Borough's attorney sent the Monitor an email with the following message:

> The Governing Body[6] and the adjacent property owners are opposed to this project and do not believe it is in the interest of the Borough of Carlstadt or its residents to move forward with the current plans.  We understand your position as the Court

---

[4] In 2003, a developer sued the Borough alleging that it was engaging in a pattern of exclusionary zoning, which resulted in the creation of "a Mount Laurel Implementation Monitor."  (Compl. ¶ 8; *see generally* D.E. 109-2, Borough Exhibit ("Ex.") L at 334.)  The Monitor is tasked with ensuring the Borough complies with its constitutional obligations to provide affordable housing as established by the New Jersey Supreme Court in *Southern Burlington County N.A.A.C.P. v. Mount Laurel Township*, 336 A.2d 713 (N.J. 1975) ("the *Mt. Laurel* decision") and its progeny.  (Compl. ¶¶ 1, 7–11.)

[5] Local zoning boards may enter land use settlements so long as the "amended plan[s are] subject to public presentation, a public hearing thereon and a public vote."  *Whispering Woods at Bamm Hollow, Inc. v. Middletown Twp. Planning Bd.*, 531 A.2d 770, 776 (N.J. Super. Ct. App. Div. 1987); *see also Friends of Peapack-Gladstone v. Borough of Peapack-Gladstone Land Use Bd.*, 971 A.2d 449, 461 (N.J. Super. Ct. App. Div. 2009) ("The procedures employed in *Whispering Woods* have since been approved in other land use cases.").

[6] The Borough's Governing Body is comprised of the Mayor and six council members.  (Borough SOMF ¶ 1.)

3

appointed monitor and leave it to you to execute the Developer's Agreement signed by Mr. Cohen[7] and his client and to issue appropriate construction permits.

(D.E. 109-2, Borough Ex. K at 333.)[8]  The Monitor proceeded to execute the Developer's Agreement on June 4, 2020.  (D.E. 109-2, Borough Ex. M at 359.)  Excavation on the Property began "in early to mid-June of 2020."  (Borough SOMF ¶ 44.)

### C. Issuance of Stop Work Orders & Tropical Storm Fay

#### 1. June 15, 2020 Stop Work Order

On June 15, 2020, the Borough issued a Stop Work Order ("SWO") directing Petra to cease all construction until further notice, citing the performance of work without a required permit. (D.E. 109-3, Borough Ex. GG at 68–69.)  The Order stated that "ALL PERMITS REQUIRED UNDER THE NEW JERSEY UNIFORM CONSTRUCTION CODE MUST BE SECURED PRIOR TO PERFORMING WORK." (*Id.* at 68.)  This SWO was issued nearly a week after the Borough's Construction Official, Frank Recanati, issued a memorandum to the Borough Manager Joseph Crifasi and Plaintiffs detailing several issues which "need[ed] to be addressed prior to the issuance of permits."  (D.E. 109-2, Borough Ex. N at 363.)  For example, Petra was to "revise and resubmit [a] survey that reflects a setback minimum of 5' for zoning approval and prior to permit issuance," and had to submit architectural plans for plumbing, electric, and fire.  (*Id.*)

That same day, the Monitor emailed Petra's counsel confirming he was aware a SWO had been issued but noting he had not been advised as to the reason for its issuance.  (D.E. 116-3, Pls. Ex. J at 50.)  The Monitor also stated as follows:  "Please be advised that the Stop Work Order is

---

[7] Mr. Cohen served as Petra's counsel.  (D.E. 116-3 at 33.)

[8] Plaintiffs claim that this email was sent in response to a series of emails exchanged between Cohen and the Monitor, among which the Monitor stated that "[i]f the [construction] permit is not issued today, I will issue it and authorize commencement of work."  (Compl. ¶¶ 41–42; D.E. 116-2, Decl. of Qassis at 9 ¶ 45–46.)  There is no support in the record for these representations save Qassis's Declaration.  Thus, this Court declines to accept them.

4

invalid and has no legal effect. The property owner is hereby authorized to remove the Stop Work Order from the chain link fence and to continue working at the site." (*Id.*)

Via letter, Plaintiffs' engineer, Mark Reme, responded to the Borough on June 16, 2020, stating he had performed an inspection of the excavation and that his office "[did] not recommend any other protections to prevent undermining of the neighboring property other than careful excavation." (D.E. 109-2, Borough Ex. R at 397.) That same day, Reme sent Qassis a letter noting the approved plans "have the wall and footing for you[r] building right at the property line," and advising him that "[c]are will be needed to prevent over excavation and undermining of the neighbors [sic] property." (D.E. 109-2, Borough Ex. Q at 399.)

### 2. June 25, 2020 Stop Work Order & Tropical Storm Fay

In the ten days between the issuance of the first and second SWO, Plaintiffs and the Borough and its officials engaged in a flurry of communications. (*See* D.E. 109-2, Borough Ex. S (June 16, 2020 Memorandum); Ex. T (document issued by Borough's Sub-Code Official Mark Sadonis stating the spacing between the shoring members was inconsistent with the shoring measurements in the shoring plan submitted and suggesting Plaintiffs' engineer visit the site); Ex. U at 402 (document issued by the Borough in response to Plaintiffs' submission indicating "[n]o permit will be granted until the shoring plan has been approved by Building Sub-Code" and that the Borough would continue to perform site visits without notice or Qassis's permission "to see that the property next door is safe guarded.").) Additionally, on June 19, 2020, Linda Nicoletti, the developer of the property located at 497 Broad Street ("the Adjacent Property"), called the police to report property damage and that the fencing surrounding Plaintiffs' Property was encroaching on her property line. (D.E. 116-3, Pltfs. Ex. BB at 228.)

5

On June 25, 2020, the Borough issued a second SWO instructing Petra to cease all construction, citing "WORK BEING PERFORMED WITHOUT BENEFIT OF APPROVAL/PERMIT" as the violation. (D.E. 109-3, Borough Ex. HH at 71.) That same day, Sadonis reported he had visited the Property both on June 24 and 25, 2020 and observed that the shoring was still not in compliance with N.J. Admin. Code § 5:23-2.34 and that he had yet to receive architectural plans. (D.E. 109-2, Borough Ex. V at 404.)

In the days following, the shoring issue became more pressing, particularly because on June 30, 2020, Sadonis issued a memorandum and attached a photograph showing that "the section towards the rear of the neighboring property wall . . . did not have any shoring in place." (Borough SOMF ¶ 80 (citing D.E. 109-2, Borough Ex. P ("Reme 5/12/25 Dep.") 52:17–53:3).) On July 6 and 8, 2020, Reme received more pictures depicting soil loss from the Adjacent Home and towards the Property, as well as a crack in the sidewalk. (Borough SOMF ¶¶ 81–83.) Sadonis's report from July 8, 2020 stated, in relevant part:

> I visited the site yesterday Tuesday, the 7th and saw the blowout of the shoring wall on the west side was bigger than it had been the week before . . . The wood shoring wall as I stated in an earlier letter is not against the earth that it is supposed to hold in place. With that being said every time it rains more of the earth washes down behind the wall causing the top earth to collapse.
>
> [ . . . ]
>
> [T]he property to the west is losing much of the earth abutting the foundation and soon will compromise the integrity of the structure and walkways adjacent to the site. There was a visible crack in the sidewalk next door adjacent to the stairs.

(Borough SOMF ¶ 84 (citing D.E. 109-3, Borough Ex. AA).) Reme was made aware of the issues raised in Sadonis's July 8, 2020 report. (Borough SOMF ¶¶ 85–87.)

That same day, Reme and the Borough's engineer, Gregory Polyniak, participated in a conference call to discuss a "more . . . robust-type shoring" plan, particularly since soil loss had

been going on and bad weather was anticipated. (*Id.* ¶¶ 89–93.) Reme agreed to provide a revised sheeting and shoring design by the afternoon of July 8 or—at the latest—the morning of July 9, 2020. (*Id.* ¶ 94.) Yet on July 9, 2020, at 12:12 p.m., Polyniak had yet to receive anything and noted there was an imminent storm. (*Id.* ¶ 85.) At 1:26 p.m., Polyniak directed Reme to develop and implement a plan immediately and advised the Borough would have to act to protect the public's safety. (*Id.* ¶¶ 97–98.)

Plaintiffs' revised shoring plans—submitted by Reme on July 9, 2020 at 2 p.m.—were found wanting and the Borough requested Plaintiff backfill the construction site at the Property. (*Id.* ¶¶ 101–102.) Consulting engineer Nathan Shuman of Titan Engineers, PC ("Titan") concluded the site was not Occupational Safety and Health Act ("OSHA") compliant and recommended backfilling or "closure of the sidewalk/road 12 feet from the edge of the excavation" based on photographs submitted to him. (Borough SOMF ¶¶ 88, 104, 106.)

On July 10, 2020, the day of Tropical Storm Fay, Ms. Nicoletti called the Borough Hall Construction Department and expressed she was "concerned her house was going to fall into the [s]ite's excavation." (*Id.* ¶ 111.) Recanati, Crifasi, Polyniak, and Shuman reported to the site. (*Id.* ¶¶ 112, 113, 116.) Based on their observations, Shuman recommended emergency stabilization, including backfilling the excavation and powering off the gas and electricity to the Adjacent Home, and Polyniak recommended an evacuation of the Adjacent Home. (*Id.* ¶¶ 118–120.) Polyniak, Reme, and Plaintiff went back and forth concerning the recommendations throughout the course of the day. (*Id.* ¶¶ 121–31.)

Polyniak proceeded to contact Fletcher Creamer, an infrastructure contractor. (*Id.* ¶ 132.) After reviewing the site's condition with Fletcher Creamer, Shuman, Reme, and Plaintiff, Polyniak issued an emergency declaration and authorized Fletcher Creamer to backfill the site, which

7

Fletcher Creamer promptly did. (*Id.* ¶¶ 134–36.) Plaintiffs' Opposition to Defendant's Motion maintains that the Borough imposed a tax lien of $32,887.12—the same amount Fletcher Creamer charged for the July 10, 2020 backfilling—on the Property.[9] (D.E. 116-2, Qassis Decl. ¶ 103.)

On August 11, 2020, the Monitor emailed the Borough's attorney, Joseph Donahue, advising him the imposition of costs unilaterally incurred by the Borough onto Plaintiffs would run afoul to the principles underlying the *Mount Laurel* doctrine. (D.E. 116-3, Pl. Ex. CC at 236.) The Monitor ordered the Borough to "immediately issue all necessary footing and foundation permits," stated Petra could "proceed with removing any stone necessary to proceed with development," and deferred ruling on Petra's reimbursement request "pertaining to the removal of stone and fill." (*Id.* at 237.) Via letters and emails to the Borough's counsel, Petra requested the Borough comply with the Monitor's orders. (D.E. 116-3, Pl. Exs. P & Q.)

### 3. September 11, 2020 Stop Work Order

The parties continued to go back and forth regarding the foundation and footing permits, as well as the shoring system, throughout the course of August and into September 2020. (Borough SOMF ¶¶ 141–48; Compl. ¶¶ 85–86.) After inspecting the Property on September 10, 2020, the Borough issued yet another SWO on September 11, 2020, ordering that all construction cease. (D.E. 109-3, Borough Ex. FF at 66.) After further negotiations and revisions, the Borough issued a footings and foundation permit on September 18, 2020. (Borough SOMF ¶ 157.)

### 4. Subsequent Developments

In the remainder of 2020 and well into 2021, the parties continued having disputes regarding Plaintiffs' shoring plan and the manner in which the excavation and construction was

---

[9] While there are mentions of the Fletcher Creamer invoice, (*see, e.g.*, D.E. 116-3, Pl. Ex. O at 73), there is no documentation substantiating the invoice in the record.

unfolding. (Borough SOMF ¶¶ 159–64.) Even after Plaintiffs brought this suit on June 10, 2022, the parties continued having disputes over modifications to the original plans. (*See generally* Borough SOMF at 46–52.)

## II. PROCEDURAL HISTORY

Plaintiffs filed their Complaint on June 10, 2022. The Complaint asserts the following causes of action: breach of contract, namely, the Developer's Agreement (Count I); breach of the covenant of good faith and fair dealing (Count II); tortious interference with contract (Count III); inverse condemnation (Count V); violations of (a) the Fifth Amendment's takings clause (Count IV), (b) the Fourteenth Amendment's equal protection clause (Count VI), and (c) substantive due process under the Fifth and Fourteenth Amendments (Count VII) *contra* 42 U.S.C. § 1983; violations of the New Jersey Civil Rights Act, N.J. Stat. Ann. §§ 10:6-1 and 6-2 and Plaintiff's equal protection and due process rights under the New Jersey Constitution, (Counts VIII and IX); and violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-12 ("NJLAD") (Count X).

On August 18, 2025, the Borough moved for summary judgment. (D.E. 109.) The parties timely completed briefing; the Motion is ripe for adjudication. (D.E. 116, 118, 121.)

## III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original). A fact is only "material" for purposes of a summary judgment motion if a

dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, the burden shifts to the nonmovant who "must set forth specific facts showing that there is a genuine issue for trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)). Although courts view all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, the nonmoving party cannot simply rely on the "mere allegations or denials of his pleadings." *Id.* at 288. Similarly, "[b]are assertions, conclusory allegations, or suspicions will not suffice." *Id.* at 288–89 (quoting *Central Dauphin*, 765 F.3d at 268–69). If the nonmoving party fails to make an adequate showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

## IV.  DISCUSSION

### A. Tortious Interference with Contract

The New Jersey Tort Claims Act ("NJTCA") provides, in relevant part, that "no action shall be brought against a public entity or public employee under th[e] act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in" the NJTCA. N.J. Stat. Ann. § 59:8-3(a). A plaintiff must file a notice of tort claim[10] with the public

---

[10] The notice of tort claim must include: the claimant's name and address; the claimant's preferred address for notices to be sent; the "date, place and other circumstances of the occurrence or transaction which gave rise to the claim

10

entity being sued "not later than the 90th day after accrual of the cause of action."  N.J. Stat. Ann. § 59:8-8.  "The notice requirement is 'a jurisdictional precondition to filing suit.'"  *Helms v. Miller*, No. 22-1325, 2025 WL 3022165, at *4 (D.N.J. Oct. 29, 2025) (quoting *Ptaszynski v. Uwaneme*, 853 A.2d 288, 294 (N.J. Super. Ct. App. Div. 2004)).

Legitimate claims suffering from technical defects may move forward pursuant to the doctrine of substantial compliance.  *H.C. Equities, LP v. Cnty. of Union*, 254 A.3d 659, 671 (N.J. 2021).  In NJTCA cases, "the doctrine of substantial compliance 'has been limited carefully to those situations in which the notice, although both timely and in writing, had technical deficiencies that did not deprive the public entity of the effective notice contemplated by the statute,'" with courts considering a multi-factor test to determine the doctrine's applicability.  *Id.* (quoting *D.D. v. Univ. of Med. & Dentistry of N.J.*, 61 A.3d 906, 923 (N.J. 2013)).  Those factors are:  (1) the lack of prejudice to the defending party, (2) a series of steps taken to comply with the statute involved, (3) a general compliance with the statute's purpose, (4) reasonable notice of petitioner's claim, and (5) a reasonable explanation regarding the lack of strict compliance.  *Id.* (quoting *Galik v. Clara Maass Med. Ctr.*, 771 A.2d 1141, 1149 (N.J. 2001)).

Plaintiff claims the Borough "intentionally interfered" with a $2 million loan Petra obtained from Centra 491 Broad Partners LLC ("the Centra Loan Agreement") by issuing multiple SWOs and backfilling the construction site at the Property on July 10, 2020.  (Compl. ¶¶ 118–24.)  Defendant argues Plaintiffs' failure to file a tort claim notice precludes this Court from considering Plaintiffs' claim.  (D.E. 109-1 ("Mov. Br.") at 18–19.)  Plaintiffs argue they substantially complied

---

asserted"; a "general description of the injury, damage or loss incurred," as known at the time of the claim's presentation; the "name or names of the public entity, employee or employees causing the injury, damage or loss, if known"; the "amount claimed as of the date of the presentation of the claim"; as well as "the basis of computation of the amount claimed."  N.J. Stat. Ann. § 59:8-4.

11

with the requirement, with their correspondence in Tropical Storm Fay's aftermath serving as notice to the Borough. (D.E. 118 ("Opp. Br.") at 18–21.)

This Court is unconvinced the correspondence following the July 10, 2020 events merits the application of the substantial compliance doctrine. The New Jersey Supreme Court's decision in *H.C.* is particularly instructive. In *H.C.*, the New Jersey Supreme Court considered whether the plaintiff's case could move forward under the doctrine of substantial compliance where no notice of tort claim was filed but the plaintiff's outside counsel wrote a series of three letters to the defendants. 254 A.3d at 662. The Court held that the plaintiff did not comply with the NJTCA's notice of claim provisions because the letters, neither individually nor collectively, "communicated the core information that a claimant must provide to a public entity in advance of filing a tort claim." *Id.* The Court made note that none of the letters identified, described, or quantified the plaintiff's potential tort claims against either defendant. *Id.*

In rejecting the argument that collectively the letters established substantial compliance with the NJTCA's notice requirements, the New Jersey Supreme Court discussed the various ways in which finding otherwise would undermine the Legislature's intent. *Id.* at 671–72. Not only does the NJTCA "consistently use[] the singular" when describing the notice claim, the Court reasoned, but "the Legislature [also] clearly intended that there be one identifiable date—not a series of dates—on which the public entity receives notice." *Id.* at 672. Thus, the Court concluded it was clear the Legislature intended for claimants to provide clear notice of their claims "not in a series of incomplete communications that must be considered together in order to infer that a claim may be filed," but in a single document. *Id.* at 671.

Plaintiffs' argument that we consider the letters its counsel sent in the aftermath of Tropical Storm Fay runs afoul of *H.C.* and its rationale. Further, this Court finds that none of the letters

12

"identify, describe, or quantify" Plaintiffs' potential tort claims. *See H.C.*, 254 A.3d at 662. The July 24, 2020 letter formally demands the Borough remove the backfill and permit Petra to recommence construction and describes the Borough's "campaign of obstruction," (Pl. Ex. N at 67–68); the August 5, 2020 letter maintains that the Borough is solely responsible for the cost of the backfilling, (Pl. Ex. O at 73); and the August 13, 2020 letter "demands that the Borough issue all necessary footing and foundation permits" as ordered by the Monitor, (Pl. Ex. P at 76). None of these letters—either individually or collectively—comply with or supply the information the NJTCA requires a claimant to provide in its notice of claim. *See* 254 A.3d at 662; N.J. Stat. Ann. § 59:8-4.

This case does not present a scenario where Plaintiffs attempted to provide notice but said notice suffered from "technical deficiencies"; based on the record before it, this Court concludes little to no attempts were made to comply with the NJTCA's notice of claim requirement. Thus, the doctrine of substantial compliance is inapplicable and Count III is dismissed. *See Caputo v. Cherry Hill Twp.*, No. 24-7723, 2025 WL 2694007, at *5 (D.N.J. Sept. 22, 2025) (holding the plaintiffs did not substantially comply with the NJTCA where the plaintiffs took "no steps to comply with the TCA, [did] not generally compl[y] with its notice provision, and provided no notice whatsoever to [d]efendant in advance of filing th[e] lawsuit"); *Yue v. Aisner*, No. 24-10413, 2020 WL 2663644, at *4 (D.N.J. Sept. 17, 2025) (dismissing a tortious interference claim against a public entity defendant for failure to comply with the NJTCA's requirements).

### B.  § 1983 Claims

"[S]ection 1983 is not a source of substantive rights but rather a mechanism to vindicate rights afforded by the Constitution or a federal statute." *Black v. Montgomery Cnty.*, 835 F.3d

13

358, 364 (3d Cir. 2016) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Pursuant to § 1983, Plaintiffs assert violations of rights under the Fifth and Fourteenth Amendments.

Section 1983 provides a cause of action for the deprivation of constitutional rights by persons acting under color of state law. *Torres v. Madrid*, 592 U.S. 306, 310 (2021). For a § 1983 cause of action, a plaintiff must demonstrate that (1) "the conduct complained of was committed by a person acting under color of state law" and (2) "the conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States." *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011); *see* 42 U.S.C. § 1983.[11]

Plaintiffs' Complaint also alleges violations of the NJCRA. The NJCRA is the state law analogue to § 1983.[12] *Perez v. Zagami, LLC*, 94 A.3d 869, 875 (N.J. 2014). Given that the NJCRA "applies not only to federal rights but also to substantive rights guaranteed by" the state's Constitution and laws, *Gormley v. Wood-El*, 93 A.3d 344, 358 (N.J. 2014), this Court's § 1983 analysis will govern for claims brought under both § 1983 and the NJCRA. *See Wang v. New Jersey State Police*, No. 18-11933, 2024 WL 3580671, at *16 (D.N.J. July 30, 2024) ("The NJCRA

---

[11] Section 1983 provides in relevant part:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

[12] The NJCRA states:

> [a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J. Stat. Ann § 10:6-2(c).

is interpreted nearly identically to § 1983 and claims under the NJCRA are generally coterminous with and subject to the same defenses and immunities as those brought under § 1983.") (citing *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443–44 (D.N.J. 2011)).

### 1. Takings Clause Violation

Defendant argues its actions throughout the course of the excavation of the Property did not amount to a taking because Plaintiffs were not deprived of all economic use of their Property. (Mov. Br. at 43.) Further, Defendant submits the three SWOs it issued in 2020 were a valid exercise of police power that do not amount to a taking. (*Id.* at 42–45.) Plaintiffs maintain they have established a partial taking and submit there is a genuine issue of material fact as to "whether the character of the Borough's action changed once the storm was over but the backfill still occupied the Property." (Opp. Br. at 34–35.)

The Takings Clause of the Fifth Amendment to the United States Constitution states that private property shall not "be taken for public use, without just compensation."[13] U.S. CONST. AMEND. V. Takings Clause jurisprudence is "characterized by '*ad hoc*, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances,'" with two broad principles guiding courts. *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017) (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002)). First, compensation is required where a regulation denies all economically beneficial or productive use of land. *Id.* Second, when a regulation impedes property use, but does not wholly deprive the owner of the property's economically beneficial use, courts consider whether a "partial taking" occurred. *Id.* Under the second principle, courts consider "the economic impact of [a] regulation, the extent to

---

[13] The Takings Clause applies to state and local governments through the Fourteenth Amendment. *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 151 (3d Cir. 2018).

15

which [the regulation] interferes with investment-backed expectations, and the character of the governmental action." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982) (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)); *Nekrilov v. City of Jersey City*, 45 F.4th 662, 672 (3d Cir. 2022).

Plaintiffs have not demonstrated a genuine issue of material fact as to either a complete or partial taking. Neither the three SWOs issued in 2020, nor the backfilling of the site, amount to a complete taking, as Plaintiffs were not deprived of all economically beneficial or productive use of their Property. Not only has Defendant put forth evidence of multiple leasing agreements and a sales contract Petra is a party to, (D.E. 109-3, Borough Exs. YY & ZZ), but by Qassis's own admission, Plaintiffs and the Borough engaged in negotiations for the purchase of the Property during the pendency of the construction, (Compl. ¶ 95). Based on the record before it, this Court concludes that N.J. Administrative Code § 5:23-2.14(a)—the provision under which the SWOs were issued—did not impact the value of the Property in the long term. Plaintiffs have not provided evidence to the contrary and the record shows that in the long term, the issuance of the SWOs and the backfilling incident did not hamper Plaintiffs' ability to make a reasonable return on their investments as Plaintiffs entered the leasing agreements in 2024. *See Nekrilov*, 45 F.4th at 673 ("The loss of profitable uses of property is occasionally considered in takings cases as a measure of economic impact.").

In considering the second and third factors of the partial regulatory takings analysis, this Court concludes the Borough's exercise of power to regulate in the public interest was not unreasonable notwithstanding the many roadblocks Plaintiffs faced. *See Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1033 (3d Cir. 1987) ("[D]istinct, investment-backed expectations are reasonable only if they take into account the power of the state to regulate in the

16

public interest."). In issuing the SWOs for Plaintiffs' failure to obtain proper permitting, the Borough did not effectuate a taking. *See Griffith v. State Dep't of Env't Prot.*, 775 A.2d 54, 63 (N.J. Super. Ct. App. Div. 2001) ("[T]he requirement that a permit be obtained before development does not itself constitute a taking."). Accordingly, Count IV is dismissed.[14]

### 2. Equal Protection Clause Violation

In a § 1983 action, although a municipality cannot be held liable under a *respondeat superior* theory, it may be held liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A plaintiff must not only allege a policy, practice, or custom violative of constitutional rights, but must also allege that said policy or custom "was the 'proximate cause' of his injuries." *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019). "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). Custom "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

---

[14] "While the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings." *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*, 482 U.S. 304, 316 (1987). "[A] property owner is barred from any claim to a right to inverse condemnation unless deprived of all or substantially all of the beneficial use of the totality of his property as the result of excessive police power regulation." *Greenway Dev. Co. v. Borough of Paramus*, 750 A.2d 764, 767 (N.J. 2000) (quoting *Pinkowski v. Twp. of Montclair*, 691 A.2d 837 (N.J. Super. Ct. App. Div. 1997)). For the reasons expressed *supra*, Count V of Plaintiffs' Complaint is also dismissed.

Plaintiffs argue the Borough has a custom of discrimination against developers of Middle Eastern ethnicity in violation of the Fourteenth Amendment's equal protection clause. (Opp. Br. at 27.) Yet in reviewing the record, this Court finds Plaintiffs have not put forth evidence to demonstrate there is a genuine issue of material fact as to whether the Borough had a policy or custom of discrimination against Middle Easterners or that Plaintiffs were treated differently from other developers that were not of Middle Eastern ethnicity or descent. For example, Plaintiffs point to Qassis's Certification, yet the statements made therein regarding the racial slurs have no corroboration in the record. Plaintiffs fail to set forth specific facts, through record evidence or testimony, revealing a genuine issue of material fact. Instead, Plaintiffs have provided this Court with a Certification rife with "[b]are assertions, conclusory allegations, [and] suspicions" which simply do not suffice. *See Jutrowski*, 904 F.3d at 288–89. Consequently, Counts VI and VIII are hereby dismissed. *See Wang*, 2024 WL 3580671, at *16; *Tucker v. City of Philadelphia*, 679 F. Supp. 3d 127, 137 (D.N.J. 2023) ("The analysis of claims under the NJCRA is identical to its federal counterpart.").

### 3. Substantive Due Process Violation

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. "[E]xecutive action violates substantive due process only when it shocks the conscience," with the meaning of this standard varying based on the factual context. *United Artists Theatre Cir., Inc. v. Twp. of Warrington, PA*, 316 F.3d 392, 399–400 (3d Cir. 2003). As applied in the land use disputes context, the Third Circuit has recognized that "[l]and-use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives." *Id.* at

18

402. "What 'shocks the conscience' is 'only the most egregious official conduct.'" *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 285 (3d Cir. 2004) (quoting *United Artists*, 316 F.3d at 400). Claims that zoning officials applied requirements to the subject property but not to other properties, conducted unannounced and unnecessary inspection and enforcement actions, delayed permits and approvals, and improperly increased tax assessments are typical in planning disputes and do not meet the "shocks the conscience" test. *See id.* at 286.

Plaintiffs have not established that there is a genuine issue of material fact as to their substantive due process claim. Given Plaintiffs' failure to substantiate the allegations concerning statements made by Borough officials, this Court disregards said statements. *See Jutrowski*, 904 F.3d at 288–89. The remaining allegations sound precisely in what the *Eichenlaub* court characterized as typical of a "normal zoning dispute" where the "shocks the conscience" test is unmet. *See Eichenlaub*, 385 F.3d at 286. As a result, Counts VII and IX are dismissed.

### C. Plaintiffs' Remaining State Law Claims (Counts I, II, and X)

A district court may decline to exercise supplemental jurisdiction over a claim if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). This Court has dismissed all claims over which it had federal jurisdiction. Only Plaintiffs' state law claims—breach of contract, breach of the covenant of good faith and fair dealing, and violations of the NJLAD—remain. This Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining claims. *See* 28 U.S.C. § 1367(c)(3).

### V. CONCLUSION

For the reasons stated above, Defendant's Motion is **GRANTED in part**. Counts III through IX of Plaintiffs' Complaint are **DISMISSED**. This Court declines to exercise jurisdiction over Counts I, II, and X. An appropriate order follows.

/s/ Susan D. Wigenton<br>
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:  Clerk
cc:    Parties
       Michael A. Hammer, U.S.M.J.